UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                            :

ELIAS SACAL CABABIE,                   :   Case No.:  18-cv-5249
BVG WORLD, S.A. DE C.V., AND        :
INMOBILARIA INSURGENTES 421, S.A. DE C.V.,     :   **COMPLAINT**
                                              :
                 Plaintiff,         :   **JURY TRIAL DEMANDED**
                                            :
        -against-                 :
                                            :
J.P. MORGAN CHASE BANK, N.A.,        :
                                            :
               Defendant.        :
                                            :
------------------------------------------------------------------------x

Plaintiffs Elias Sacal Cababie ("Sacal"), BVG World, S.A. de C.V. ("BVG World"), and

Inmobilaria Insurgentes 421, S.A. de C.V. ("Inmobilaria," and together with BVG World, "BVG")

(collectively, "Plaintiffs"), by counsel, Meister Seelig & Fein LLP, as their Complaint against

defendant J.P. Morgan Chase Bank, N.A. ("Defendant" or "J.P. Morgan"), allege, on their own

knowledge as to facts within their knowledge and on information and belief as to the remaining

allegations, as follows:

## SUMMARY OF ACTION

1.      This action is brought to seek redress for Defendant J.P. Morgan's brazen and

malicious fraudulent inducement of Plaintiffs, by which Sacal, a Mexican condominium

developer, and BVG World, his operating company, transferred control of – including the right to

sell – hundreds of millions of dollars of valuable real estate assets to J.P. Morgan on or about

September 24, 2012, based on the promise that J.P. Morgan would sell the properties.  The sales

would permit Plaintiffs to pay off a $99 million loan from J.P. Morgan and put the excess proceeds

– which the parties agreed in 2012 would be at least $221 million – to use in other business ventures.

2.        However, as Plaintiffs have come to learn – and as J.P. Morgan representatives have cavalierly admitted – J.P. Morgan never intended to fulfill its promise.  Instead, it used the promise to induce Plaintiffs to hand J.P. Morgan control of a trust that contains several properties in Mexico so that J.P. Morgan could, in bad faith, sit on the properties in perpetuity and thus block Plaintiffs from paying back their loan to J.P. Morgan or investing in other projects, all the while accruing substantial interest and fees in favor of J.P. Morgan.

3.        J.P. Morgan's motive for executing this deceitful maneuver was, and has been, to exact revenge on Sacal – as part of a broader campaign to slander him, sully his reputation, and interfere with his and BVG's business – following a series of business disputes between Plaintiffs and J.P. Morgan that were – or so Plaintiffs thought – resolved in April 2010.

4.        Since then, J.P. Morgan officers have directed such personal animus and hatred at Sacal – including venomous, anti-Semitic slurs spewed by Eduardo Cepeda Fernandez ("Eduardo Cepeda"), the head of J.P. Morgan's Mexican unit, as well as by Miguel Angel Barbosa Machado ("Miguel Barbosa"), then a Managing Director of J.P. Morgan – that the CEO of J.P. Morgan's private banking arm for Latin America, Chris Harvey, later apologized to Sacal on behalf of the entire bank for its personal attacks on him.

5.        J.P. Morgan's far-reaching campaign of harassment has included filing a frivolous criminal complaint against Sacal in Mexico, "to teach the Mexican Jew a lesson," and filing and instigating others – including the fiduciary of the trust that holds the properties – to file baseless litigation against Plaintiffs in Mexico.

6.      Meanwhile, J.P. Morgan has willfully exploited its position as a trustee to enrich itself at Plaintiffs' expense, maximizing its own profits by generating trust administration fees and interest on the principal of the underlying loan, while intentionally causing harm to Plaintiffs.

7.      As a result of J.P. Morgan's egregious conduct, Plaintiffs bring this action: (i) to recover the hundreds of millions of dollars they would have reaped had J.P. Morgan fulfilled its promise to sell the properties; (ii) to recover the amounts by which J.P. Morgan has been unjustly enriched as a result of its fraudulent inducement; (iii) for tortious interference with Plaintiffs' business relationships; (iv) for violations of 18 U.S.C. § 1962(c); (v) for defamation; and (vi) for reformation of the trust agreement to reflect J.P. Morgan's promise to sell the properties as soon as possible and enjoining J.P. Morgan from selling the properties without Plaintiffs' approval.

## PARTIES, JURISDICTION, AND VENUE

8.      Plaintiff Sacal is a citizen of Mexico and resides in Mexico.

9.      Plaintiff BVG World is a Mexican corporation with its principal place of business in Mexico City.  BVG World is the transferee of the assets, rights, and liabilities of three Mexican corporations – Inmobilaria BVG Bajamar, S.A. de C.V., Portochervo Acapulco, S.A. de C.V., and Administraciones BVG, S.A. de C.V. – which had previously owned and controlled three of the properties at issue in this matter, known as Bajamar, Peninsula, and Grand Island, respectively.

10.      Plaintiff Inmobiliaria is a Mexican corporation with its principal place of business in Mexico City.

11.      Defendant J.P. Morgan is a national banking association chartered under the laws of the United States with a place of business in New York, New York.

12.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship between Plaintiffs and Defendant in that Plaintiffs

are citizens of a foreign country, and Defendant is a citizen of Ohio (for purposes of diversity jurisdiction), and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.    This Court also has personal jurisdiction over Defendant because New York is Defendant's worldwide headquarters and principal place of business.

14.    Venue is proper in Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendant's worldwide headquarters are located in this judicial district and a substantial part of the events giving rise to the claims occurred in this judicial district.

## BACKGROUND

15.    Sacal, through BVG and related companies, is a successful developer of luxury condominiums throughout Mexico, including in the cities of Cancun, Puerto Vallarta, Ixtapa, Acapulco, and in Baja California.

16.    In 2005, Sacal's success attracted the notice of J.P. Morgan, which began to aggressively pursue a relationship with him.

17.    Beginning in or about 2005, Sacal began to use J.P. Morgan for virtually all of his personal banking needs, as well as those of BVG and its related subsidiaries.

18.    Sacal availed himself of J.P. Morgan's financial and tax advisory services, and invested personal funds through J.P. Morgan's Private Bank.

19.    However, J.P. Morgan's Private Bank soon steered Sacal toward unsuitable high-risk investments that lost all or substantially all of their value, which caused Sacal to realize a loss of over $27 million.

20.    J.P. Morgan also encouraged Sacal's operating company, BVG World, to borrow approximately $100 million from J.P. Morgan in May 2007, (then) guaranteed in part by Sacal, pursuant to a term loan agreement.

4

21.    J.P. Morgan did this in order to create liquid assets that its private banking division could invest at its discretion to earn large commissions and fees.

22.    Although BVG had not missed a single interest payment on any loan obligation to J.P. Morgan and was otherwise in compliance with the terms of the loan agreement, J.P. Morgan brought suit against Sacal and BVG in in January 2010 in both New York state court and in Mexico seeking immediate repayment of nearly $200 million it claimed was due and owing.

23.    At the time, J.P. Morgan disparaged Sacal and BVG to third parties, making gratuitous and baseless attacks on Sacal, evidencing J.P. Morgan's extraordinary bad faith and intention to inflict harm on Sacal and BVG.

24.    Their disputes, which also included a suit by Sacal and BVG against J.P. Morgan in New York state court, were ultimately settled in April 2010.

25.    However, J.P. Morgan was not content to put the dispute behind it, and between 2010 and 2012, concocted a new plan to harm Sacal and BVG.

**J.P. Morgan Fraudulently Induces Sacal to**
**<u>Transfer Control of His Valuable Properties to It</u>**

26.    In several telephonic and in-person meetings in 2011 and 2012 (including in meetings in J.P. Morgan's New York offices and BVG's offices in Mexico City), representatives of J.P. Morgan and Sacal had numerous conversations concerning properties in Mexico owned and controlled by BVG, known as Bajamar, Peninsula, Insurgentes, Grand Island, and La Cima (together, the "Properties").

27.    In these conversations, representatives and agents of J.P. Morgan told Sacal (and hence, BVG) that if Sacal caused BVG to transfer control of – including the right to sell –BVG's Properties in Mexico to an existing trust created to hold collateral securing BVG World's repayment of debt (the "Trust"), then J.P. Morgan would hire real estate brokerage Cushman &

Wakefield ("Cushman & Wakefield") to sell the Properties as soon as possible, use the proceeds to pay off the $99 million principal due on J.P. Morgan's loan to BVG, and permit Sacal and BVG to keep the excess proceeds.

28.     The J.P. Morgan representatives who made such statements included Miguel Barbosa and Jorge Sosa, both managing directors of J.P. Morgan at the time.

29.     Additionally, such statements were made at J.P. Morgan's behest by Mario Navarro, then a senior vice president of Cushman & Wakefield's Mexico division.

30.     However, despite its promises, J.P. Morgan did not intend to sell the Properties, but rather sought to take control of them in order to exert pressure over and cause harm to Sacal and BVG.

31.     As part of its fraudulent scheme, in or about January 2012, J.P. Morgan retained real estate brokerage Cushman & Wakefield and instructed it to make a business plan for the sale of the Properties.

32.     J.P. Morgan instructed Cushman & Wakefield to make a plan to lend credence to their promise to Sacal and BVG that if they transferred control of the Properties to J.P. Morgan, then J.P. Morgan would cause them to be sold.

33.     In or about April 2012, Cushman & Wakefield provided Plaintiffs and J.P. Morgan with *minimum* sales prices for the Properties totaling $327,788,805.25, with minimum sales prices for each property summarized as follows:

       a.  Bajamar: $164,574,759.50;
       b.  Peninsula: $25,120,413.75;
       c.  Insurgentes: $36,500,000;
       d.  Grand Island: $82,508,772; and
       e.  La Cima: $19,084,860.

34.    Cushman & Wakefield broke down the minimum sales prices as follows:

| Property name, location in Mexico, and BVG-entity in control prior to Trust Agreement | Description of property | Minimum sales prices, as stated by Cushman & Wakefield |
|---|---|---|
| **Bajamar**, municipality of Ensenada, state of Baja California; previously controlled by Inmobilaria BVG Bajamar, S.A. de C.V. | Housing lots: 607,165.07 m$^2$<br><br>Commercial lots: 53,640.77 m$^2$<br><br>Housing lots intended for condominium: 262,547.20 m$^2$<br><br>"La Punta" property: 41,049.62 m$^2$ | $150/m$^2$ = $91,074,760.50<br><br>$200/m$^2$ = $10,728,154.00<br><br><br>$200/m$^2$ = $52,509,440.00<br><br><br>$250/m$^2$ = $10,262,405.00 |
| **Peninsula**, municipality of Acapulco, state of Guerrero; previously controlled by Portochervo Acapulco, S.A. de C.V. | Housing lots: 200,963.31 m$^2$ | $125/m$^2$ = $25,120,413.75 |
| **Insurgentes**, borough of Cuauhtémoc in the federal district of Mexico City; previously controlled by plaintiff Inmobilaria Insurgentes 421, S.A. de C.V. | Three towers comprising 22,900 m$^2$ | $36,500,000.00 |
| **Grand Island**, municipality of Cancun, state of Quintana Roo; previously controlled by Administraciones BVG, S.A. de C.V. | Lots with an area of 137,514.62 m$^2$ | $600/m$^2$ = $82,508,772.00 |
| **La Cima**, municipality of Acapulco, state of Guerrero; previously controlled by plaintiff BVG World, S.A. de C.V. | Lots with an area of 84,821.60 m$^2$ | $225/m$^2$ = $19,084,860.00 |
| **TOTAL** | | **$327,788,805.25** |

35.     Based on J.P. Morgan's promise that it would work with Cushman & Wakefield to sell the Properties, Sacal and BVG agreed to transfer control of the Trust containing the Properties to J.P. Morgan on or about September 24, 2012.

36.     Plaintiffs would not have agreed to such a transfer of control absent J.P. Morgan's promise.

37.     Indeed, had Plaintiffs not transferred control of the Trust – including the right to sell the Properties – to J.P. Morgan, they could have sold the Properties themselves.

**The Trust Agreement**

38.     The BVG entities, as trustors, and J.P. Morgan, as trustee, entered into an irrevocable trust agreement on September 24, 2012 (the "Trust Agreement").[1]

39.     The Trust Agreement was the fourth amendment to a trust agreement between the parties that concerned the payment of BVG's obligations to J.P. Morgan for the outstanding $99 million principal loan.

40.     The Trust Agreement granted J.P. Morgan absolute management control over the Properties, including the decision to sell or not to sell.

41.     The prior version of the Trust Agreement – the third amendment – had not afforded J.P. Morgan such control.

42.     Trust Agreement § 2.01(a), which addresses "Creation of the Trust," provides:

> With the purpose of implementing a payment arrangement of the Acknowledged Debt [*i.e.*, BVG World's debt of $99,150,000], the Trustors have transmitted prior to this date and irrevocably, the ownership of the Trust Property in favour of the Fiduciary, for the Purposes of the Trust, with everything that by its own right that corresponds to them, free of tax, and without reserves or limitations

---

[1]     The Trust Agreement is in Spanish.  Quotations from the Trust Agreement herein are derived from a certified English translation thereof.

> or rights concerns of any nature, jointly with associated rights, inherent, resulting or derived from them …

43.     The Trust further provided, in Section 2.03, entitled the "Purposes of the Trust," that one of the purposes of the trust was as follows:

> That the Fiduciary [The Bank of New York Mellon, S.A., Institutición de Banca Múltiple], according with the procedure described in Section 8.02 of this Trust and towards the proxies appointed by the First trustee [J.P. Morgan] for such purposes, [sells] the Properties On Sale to pay the Acknowledged Debit, in the terms and conditions as provided in this Trust.

Trust Agreement § 2.03(b).

44.     The Trust Agreement provided that BVG's debt "will be paid exclusively with the net proceeds of the sales of real property assets on sale, under the terms and conditions foreseen herein, and therefore, BVG World is not bound to pay the Acknowledged Debit." *Id.* at § 1.03(b).

45.     Along these lines, Section 4.01 provided, as to the Properties:

> Inmuebles Bajamar, Inmuebles Grand Island, Inmueble Insurgentes, Inmuebles La Cima and Inmuebles Peninsula, which will be sold in the terms and conditions established by this Trust and the proceeds from the sale of them will be applied for the payment of the Acknowledgement Debit, pursuant to prior Section 1.04[.]

46.     The Trust Agreement provided that interest would not run "for a two-year period from this agreement signing date on" (Trust Agreement § 1.03(c)), meaning that J.P. Morgan had incentive to delay the sale of the Properties beyond the two-year period because only then would J.P. Morgan recover any interest.

47.     After the two-year mark, interest would "become due respect to the unpaid balance of main of the Acknowledged Debit at an annual rate of interest equal to LIBOR plus 2.5% (two point five per cent)." *Id.* at § 1.03(c).

48.     The Trust Agreement provided that "The interest[] shall be paid as the amount arising from sales of the Properties for Sale, …" *Id.*

49.     The Trust Agreement provided for how "the Fiduciary will apply the resulting proceeds from the sale of the Properties for Sale" (*id.* at § 1.04, titled "Application of Resources by Alienation") – namely, with the first funds going "to pay whatever debit amount up to that date to the Fiduciary, according to this Trust," and then to pay "whatever expenses, rights, fees, commissions, pending or incurred taxes during the alienation of properties on sale, including without restriction, the expenses caused because of hiring third parties and whatever resulting obligations of part or the entire Properties for Sale, as long as and in the terms that the First Trustee [J.P. Morgan] has approved these expenses." *Id.*

50.     The Trust Agreement provided that, "once the Acknowledged Debit has been fulfilled, the remains, if any, will be handed on [to] the Trustors and BVG World, according to the instructions given to the Fiduciary for this purpose by BVG World." *Id.*

51.     The Trust Agreement set forth the procedure for the sale of the Properties.

52.     Section 8.01 provided:

> The parties agree that during term of this Trust Agreement, the Properties for Sale shall be sold for the payment of the Acknowledged Debit in accordance with the following:
>
> (a) The First Trustee [J.P. Morgan] will hire a Broker or any other person he considers appropriate, for promotion and sale of the Properties for Sale as provided in this Trust.
>
> …
>
> (d) BVG World and the Trustors will transfer the Fiduciary, for benefit of the Trust, the respective buyers, all the rights, licenses, permits and authorizations regarding the Properties for Sale.

(e) BVG World and the First [T]rustee may determine jointly any sales procedure for the Properties for Sale that allows to pay the Acknowledged Debit as soon as possible.

*(f) All decisions about regarding the Properties for Sale will be taken only by the First Trustee [J.P. Morgan] without restriction and without reference to BVG World, including without limitation the possibility to adjust to the low sales prices of the same*, (1) in case the proceeds of sales of Properties for Sale do not reach at least U.S. $ 25,000,000.00 (twenty five million dollars *00/100)* for the first two years from date of execution of this Agreement, or (2) *after the fifth anniversary of date of execution of this Agreement if it has not been paid in full Acknowledged Debit*, on the understanding that if the First Trustee instructs the selling of all the Properties for Sale and the product of the same is not enough to pay in full the Acknowledged Debit, BVG World is not obliged to pay the unpaid balance of the Acknowledged Debit.

(Emphasis added.)

53.     From the time the parties entered into the Trust Agreement through the present, the Properties' value (in U.S. dollars) has far exceeded the "Acknowledged Debit" of $99,150,000.

54.     All parties have known that fact from the time they entered into the Trust Agreement through the present.

55.     The Trust Agreement also attached as an exhibit the minimal sales prices list for the Properties discussed above, noting that it would be provided to "real estate brokers and sellers," with the exception that the Insurgentes property would be offered for sale for $36 million instead of $36.5 million.  *Id.* at §§ 7.03(b)(vi), 8.03(c).

**J.P. Morgan Has Failed to Keep its Promise to Sell the**
**Properties and Has Maliciously Sought to Inflict Further Harm Upon Plaintiffs**

56.     Rather than act as a good steward and timely usher the Properties toward sale, as promised, J.P. Morgan, as trustee, has instead failed to fulfill its obligations over the past five years.

11

57.     In doing so, J.P. Morgan has revealed that it never intended to fulfill its promise to sell the Properties "as soon as possible."

58.     To the contrary, J.P. Morgan plotted to gain control over the Properties in order to prevent the sales from happening.

59.     Indeed, in or about January 2013, J.P. Morgan's Jorge Sosa (a managing director) and Melanie Foster (an executive director) told Sacal in J.P. Morgan's New York offices that J.P. Morgan intended to wait at least five years from the execution of the Trust Agreement before seeking to sell the Properties.

60.     Pursuant to Trust Agreement § 8.01(f), after five years – *i.e.*, starting September 24, 2017 – J.P. Morgan would have an absolutely unfettered right to sell the Properties at any time, without restriction or interference by BVG World, whereas within the five years, BVG World and the J.P. Morgan would "determine jointly any sales procedure," pursuant to § 8.01(e).

61.     This was agreed to in case the Properties could not be sold after a bona fide effort to do so, not – as J.P. Morgan schemed – in case the Properties were intentionally withheld from the market.

62.     By waiting out the five years, without even attempting to sell the Properties, J.P. Morgan could thus, theoretically, continue to keep BVG World on the hook for its debt in perpetuity and accrue interest, as J.P. Morgan would retain in its sole control the ability to sell – or withhold from sale – the Properties that secured the debt.

63.     J.P. Morgan thus plotted – in advance of entering into the Trust Agreement – to gain control over the Properties in order to prevent the promised sales of the Properties from happening.

64.     Mexican attorney Francisco Xavier Cortina Cortina, who has represented J.P. Morgan in the years since 2012, has repeatedly remarked since then – including in conversations with Sacal, and upon information and belief, with others – that J.P. Morgan was waiting for the fifth anniversary of the Trust Agreement before even trying to sell any of the Properties.

65.     Upon information and belief, J.P. Morgan has never instructed Cushman & Wakefield to take steps to sell any of the Properties and Cushman & Wakefield has never taken steps to do so.

66.     To this day, the Properties remain unsold and under J.P. Morgan's control.

67.     J.P. Morgan is earning interest it does not deserve on the loan principal as well as administrative fees that apply only because it schemed to refuse and fail to sell the Properties within two years.

68.     Yet, merely blocking the sale of the Properties and earning substantial interest and fees has not satisfied J.P. Morgan's desire for vengeance against Sacal and BVG.

69.     At J.P. Morgan's urging, the trust's fiduciary, The Bank of New York Mellon, S.A. de C.V. (today, C.I. Bank, S.A. de C.V.) brought suit in 2012 in Mexico against entities owned and controlled by Sacal and BVG relating to the Insurgentes property, alleging that Sacal and BBG – who had the power to lease the property – had also improperly conveyed sublease rights.

70.     However, that claim had no basis and the true aim of the lawsuit was to cancel the property's leases and thus deprive Sacal and BVG of income.

71.     The lawsuit was dismissed on May 6, 2015, following a full trial, at which the court held that Sacal and BBG had properly exercised their leasing authority.

72.     The dismissal was upheld on appeal on September 4, 2015 and again on July 21, 2016.

73.    J.P. Morgan has also refused to comply with its obligations under the Trust Agreement by failing to pay property taxes and maintenance relating to the Properties designated for sale, as is required by Trust Agreement § 7.03(d).

74.    This was the subject of a lawsuit in Mexico, pursuant to which J.P. Morgan was ordered to pay the taxes on June 12, 2017.  Despite this being the final resolution of the lawsuit, J.P. Morgan has refused to pay the taxes, even when ordered to do so (again) by the court on October 3, 2017.

75.    In that same lawsuit, Cushman & Wakefield's Mario Navarro testified and admitted, on cross-examination, that before he was deposed, he had been coached by J.P. Morgan and J.P. Morgan's lawyers to testify in their favor.  Navarro's testimony was subsequently deemed invalid by the court.

76.    J.P. Morgan has also brought baseless claims directly against Sacal in an attempt to harm his reputation.

77.    J.P. Morgan brought a civil suit personally against Sacal in Mexico demanding $10 million in a purported breach of contract claim that was dismissed by the Mexican court in a judgment dated September 30, 2015.

78.    Moreover, J.P. Morgan has sought to smear Sacal by lodging baseless criminal allegations against him, including, with regard to the leasing of the Insurgentes property.  Despite J.P. Morgan pressing the matter, it has presented no plausible basis to even present the matter to a judge to request an arrest order.

79.    Rather, the conduct of Defendant is under close scrutiny by the Mexican authorities. In response to a criminal case initiated by Sacal in Guerrero, Mexico in 2015, a prosecutor has conducted a criminal investigation into fraud by J.P. Morgan.  Based on the preliminary evidence

collected, the prosecutor recently (in June 2018) requested that a judge detain Eduardo Cepeda, the chairman of the board and chief executive officer of Defendant's Mexican unit, and former J.P. Morgan managing director Miguel Barbosa.  Upon review of the evidence presented by the prosecutor, a criminal court judge has found the elements of felony fraud in the amount of $100 million, and issued a detention order for Eduardo Cepeda and Miguel Barbosa.

**The Consequences of J.P. Morgan's Conduct**

80.     As a result of J.P. Morgan's fraudulent scheme not to proceed with the business plan it promised Plaintiffs it would pursue, J.P. Morgan has effectively held hostage Plaintiffs' valuable real estate assets, which J.P. Morgan acknowledged in 2012 were worth $327,788,805.25.

81.     J.P. Morgan refused, without any valid justification, Sacal's offer, in 2016, to buy the Insurgentes property for $30 million – which the Trust Agreement specifies is an appropriate sales price for the property, if not sold by June 2014.  *See* Trust Agreement § 8.03(c).

82.     J.P. Morgan's refusal to sell one of the Properties contradicts its clear promise to sell the Properties "as soon as possible."

83.     At the same time, J.P. Morgan has generated fees and interest by holding the Properties in the Trust, including interest pursuant to Trust Agreement § 1.03(c), amounting to approximately $2 million since the Properties were placed in the Trust in 2012.

84.     J.P. Morgan should not be permitted to retain the benefits of its fraud and unjust enrichment.

85.     J.P. Morgan has also continued to try to injure Sacal's reputation by badmouthing him to business peers and by seeking to deter lenders from making loans to him and his companies.

86.     Eduardo Cepeda, the chairman of the board and chief executive officer of J.P. Morgan Grupo Financiero, S.A. de C.V., J.P. Morgan's Mexican unit, and Miguel Barbosa, then

a J.P. Morgan Managing Director, personally threatened to harm the reputations of Sacal and BVG between 2011 and 2013.

87.     Eduardo Cepeda told Sacal that he would instruct all Mexican banks not to lend money to him or BVG until after BVG was completely ruined.

88.     Moreover, from in or about April to July 2014, Eduardo Cepeda and Miguel Barbosa used virulent anti-Semitic slurs when referring to Sacal's religion and community in Mexican business circles, disparaging Sacal's being both Mexican and Jewish.[2]

89.     When word got back to Sacal and he reached out to Eduardo Cepeda to address the personal attacks, J.P. Morgan retaliated by filing the baseless criminal complaint in July 2014.

90.     The level of personal rancor from J.P. Morgan to Sacal was so severe that in a meeting in or about March 2016 at J.P. Morgan's offices in New York, Chris Harvey, the CEO of J.P. Morgan's private banking arm for Latin America, made a point of apologizing to Sacal – on behalf of the entire bank – for J.P. Morgan's personal attacks on him.   The meeting was attended by J.P. Morgan's Miguel Barbosa and Jorge Sosa, as well as Sacal's son, Marcos Sacal.

91.     Nonetheless, Eduardo Cepeda has continued to disparage Sacal and express anti-Semitic vitriol in reference to Sacal.  Sacal has learned that in or about May 2018, Eduardo Cepeda told a high-ranking official of C.I. Bank, S.A. de C.V. that J.P. Morgan's Mexican unit would no longer do business with members of the Jewish community because of Eduardo Cepeda's personal animus against them in general, and against Sacal in particular.  Sacal has learned that Eduardo

---

[2]     Plaintiffs reserve their rights to seek relief for J.P. Morgan's discriminatory and retaliatory conduct, including under the Equal Credit Opportunity Act (15 U.S.C. § 1691 *et. seq.*).  Plaintiff Sacal has already filed a complaint against J.P. Morgan with Mexico's National Council to Prevent Discrimination (in Spanish: Consejo Nacional para Prevenir La Discriminación ((CONAPRED)).

Cepeda regularly refers to Sacal as "El Judio" (or "the Jew") when discussing him with the same C.I. Bank official.

92.     J.P. Morgan continues to interfere with Plaintiffs' access to credit from other banks, including BBVA Bancomer, Inbursa, and Santander.

93.     Among other things, when other banks contact J.P. Morgan to inquire about their lending relationship with Plaintiffs, J.P. Morgan falsely states that Plaintiffs have been delinquent in making payments on debt from J.P. Morgan, when J.P. Morgan knows that, in reality, Plaintiffs have always made such payments on time.

94.     J.P. Morgan has thus, with malice, impeded and continues to impede Plaintiffs' financing of new real estate development projects.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Fraud in Inducement of Trust Agreement)**

95.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

96.     With the intent of inducing Plaintiffs to transfer control of – including the right to sell – the Properties to J.P. Morgan, J.P. Morgan knowingly and/or recklessly made and/or participated in the making of material misrepresentations of fact and the omission of material facts to Sacal and BVG, including but not limited to promising that J.P. Morgan would sell the Properties so that the loan would be repaid.

97.     In fact, as J.P. Morgan representatives have since admitted, J.P. Morgan had no intention to sell the Properties within five years of entering into the Trust Agreement.

98.     In justifiable reliance upon J.P. Morgan's misrepresentations and omissions, and without knowledge of the truth, Sacal agreed to the Trust Agreement and caused control of the Properties to be transferred to J.P. Morgan.

99.     Had Plaintiffs known that the information they received from, and the representations made by, J.P. Morgan were false, Plaintiffs would not have agreed to the Trust Agreement or caused control of the Properties to be transferred to J.P. Morgan.

100.    By reason of the foregoing, Plaintiffs are entitled to damages against J.P. Morgan in amounts to be determined at trial, but not less than $400 million plus punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Unjust Enrichment)

101.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

102.    By its wrongful actions, J.P. Morgan has been unjustly enriched at Plaintiffs' expense.

103.    It is against equity and good conscience to permit J.P. Morgan to retain the benefits of its wrongful conduct.

104.    As a direct and proximate result of the wrongful conduct of J.P. Morgan, Plaintiffs have suffered and continue to suffer financial injury. Accordingly, Plaintiffs are entitled to damages in an amount to be determined at trial, but not less than $400 million plus punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Tortious Interference with Business Relationship)

105.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

106.    Plaintiffs have had business relations with banks BBVA Bancomer, Inbursa, and Santander, including by meeting with them to discuss terms for commercial loans.

107.    J.P. Morgan interfered with those business relations for the wrongful purposes of preventing them from obtaining financing for real estate development projects, and to harm their reputations.

108.    Moreover, J.P. Morgan used dishonest, unfair, and improper means when interfering with Plaintiffs' business relations, including by falsely stating that Plaintiffs were delinquent in in making payments on debt from J.P. Morgan and thus were not suitable borrowers of funds from the prospective lenders.

109.    J.P. Morgan's wrongful acts injured the relationships between Plaintiffs and BBVA Bancomer, Inbursa, and Santander, and dissuaded the banks from lending funds to Plaintiffs, thereby harming Plaintiffs' real estate development projects.

110.    By reason of the foregoing, Plaintiffs are entitled to damages against J.P. Morgan in amounts to be determined at trial, but not less than $400 million plus punitive damages.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Civil RICO – Violation of 18 U.S.C. § 1962(c))**

111.    Plaintiffs repeat and allege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

112.    The association of J.P. Morgan executives, including Miguel Angel Barbosa Machado and Jorge Sosa, constituted an enterprise within the meaning of 18 U.S.C. § 1961(c), which enterprise was engaged in, and whose activities affected, foreign commerce. This enterprise was continuous in that it lasted for several years, had an ascertainable structure, and acted in ways distinct from the predicate offenses alleged by Plaintiffs.  This enterprise was continuous for the additional reason that the predicate acts were a regular way of conducting J.P. Morgan's ongoing business and of conducting or participating in the ongoing RICO enterprise.

113.    J.P. Morgan is a person within the meaning of 18 U.S.C. § 1961(3) and separate from the enterprise.

114.    J.P. Morgan and other members of the enterprise, having devised the scheme or artifice to defraud, and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of mail, wire, radio, or television communication in interstate or foreign commerce writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

115.    Specifically, in or about April 2012, by use of international telephone wires, Jorge Sosa, a J.P. Morgan executive based in New York, induced Plaintiffs in Mexico to enter into the Trust Agreement and transfer control of – including the right to sell – the Properties to J.P. Morgan.

116.    In or about April 2012, Jorge Sosa also used international wires to send multiple emails to Sacal in Mexico regarding the Trust Agreement and the transfer of control of the Properties to J.P. Morgan.

117.    In or about April 2012, Jose Raz Guzman, an attorney representing J.P. Morgan, used international wires to send multiple emails to Sacal regarding the Trust Agreement and the transfer of control of the Properties to J.P. Morgan.

118.    Each participant knew, expected, reasonably foresaw, and intended that these transmissions by means of mail, wire, radio, or television communication in foreign commerce would be used in furtherance of the racketeering scheme, and that such use was an essential part of the scheme.

119.    J.P. Morgan willfully and with intent to defraud contacted Plaintiffs via international wires and induced Plaintiffs to enter into the Trust Agreement and transfer control of the Properties to J.P. Morgan to enable J.P. Morgan to sell the Properties and pay Plaintiffs' debt.

120.    Plaintiffs reasonably relied upon J.P. Morgan's misrepresentations and were injured by J.P. Morgan's fraudulent conduct.

121.    The aforesaid acts had the same or similar purposes, results, participants, victims, and/or methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events.  The pattern of racketeering activity J.P. Morgan engaged in consisted of a scheme executed by J.P. Morgan from in or about January 2012, and continuing at least through September 2012, to induce Plaintiffs to enter into the Trust Agreement and transfer control of the Properties.  That pattern included multiple predicate acts of wire fraud.

122.    The racketeering acts identified hereinabove were related to one another and formed a pattern of racketeering activity in that they: (a) were in furtherance of a common goal, including the goal of profiting illegally by fraudulently inducing Plaintiffs to enter into the Trust Agreement and transfer control of the Properties; (b) used similar methods to perpetrate the fraud, including the use of similar misrepresentations regarding J.P. Morgan's intent to sell the Properties as soon as possible; (c) had similar participants; and (d) had the same victims.

123.    Plaintiffs have been injured in their business or property by reason of J.P. Morgan's violations of 18 U.S.C. § 1962(c).  As a direct result of these violations, Plaintiffs have suffered and continue to suffer financial injury.

124.    By reason of this violation of 18 U.S.C. § 1962(c), Plaintiffs are entitled to treble damages in an amount to be determined at trial, but not less than $1.2 billion plus punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Defamation)

125.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

126.     Between in or about April 2010 and the present, J.P. Morgan has falsely told other banks, including BBVA Bancomer, Inbursa, and Santander, that BVG has been delinquent in making payments on debt from J.P. Morgan, when Plaintiffs have always made such payments on time.

127.     Eduardo Cepeda Fernandez, the chairman of the board and chief executive officer of J.P. Morgan Grupo Financiero, S.A. de C.V., J.P. Morgan's Mexican unit, instructed Mexican banks not to lend money to Plaintiffs.

128.     J.P. Morgan's specific statements about Plaintiffs' delinquent payments and creditworthiness, which were knowingly false, were published to other banks in New York and Mexico.

129.     J.P. Morgan's statements were uttered with malice, in that it knew the statements were untrue at the time it stated and/or uttered them for spiteful purposes, namely, to injure Sacal's reputation and deter lenders from making loans to him and his companies.

130.     J.P. Morgan, with knowledge or reckless disregard for the falsity of the statements failed to correct the statements made to the other banks.

131.     As a direct and proximate result of J.P. Morgan's foregoing statements amounting to defamation per se, Plaintiffs have suffered harm to their trade, business, or profession, which has impugned the basic integrity and/or creditworthiness of BVG and Sacal, and prevented BVG from financing new real estate development projects, causing BVG and Sacal financial injury.

132.     Accordingly, Plaintiffs are entitled to damages against J.P. Morgan in amounts to be determined at trial, but not less than $400 million plus punitive damages, as well as an order enjoining J.P. Morgan from further publication of the defamatory statements.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Reformation)

133.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

134.    With the intent to fraudulently induce Plaintiffs to transfer the Properties to the Trust, J.P. Morgan agreed to sell the Properties as soon as possible so that Plaintiff's loan would be repaid.

135.    Despite such agreement, the written Trust Agreement does not reference J.P. Morgan's promise to sell the Properties as soon as possible.

136.    Plaintiffs entered into the Trust Agreement and transferred control of the Properties to J.P. Morgan in the belief that J.P. Morgan would sell the Properties as soon as possible and pay down the debt.

137.    In fact, as J.P. Morgan representatives have since admitted, J.P. Morgan had no intention to sell the Properties as soon as possible, and instead intended to wait at least five years from the execution of the Trust Agreement before seeking to sell the Properties, at which point J.P. Morgan could sell the Properties without consulting Plaintiffs.

138.    As a direct and proximate result of the foregoing, J.P. Morgan has not sold the Properties or repaid the loan, and has instead generated fees and interest by holding the Properties in the Trust under its control.

139.    Accordingly, Plaintiffs are entitled to an order reforming the Trust Agreement to reflect J.P. Morgan's promise to sell the Properties as soon as possible and enjoining Defendant from selling the Properties without Plaintiffs' approval.

**WHEREFORE**, Plaintiffs Elias Sacal Cababie, BVG World, S.A. de C.V., and Inmobilaria Insurgentes 421, S.A. de C.V. respectfully request that judgment be entered against

Defendant J.P. Morgan Chase Bank, N.A. awarding:

a) On the First Cause of Action, Plaintiffs' claim against Defendant for fraudulent inducement, compensatory damages against J.P. Morgan in an amount to be determined at trial, but not less than $400 million, plus punitive damages to be determined at trial;

b) On the Second Cause of Action, Plaintiffs' claim against Defendant for unjust enrichment, restitutionary damages against J.P. Morgan in an amount to be determined at trial, but not less than $400 million, plus punitive damages to be determined at trial;

c) On the Third Cause of Action, Plaintiffs' claim against Defendant for tortious interference with business relationship, compensatory damages against J.P. Morgan in an amount to be determined at trial, but not less than $400 million, plus punitive damages to be determined at trial;

d) On the Fourth Cause of Action, Plaintiffs' civil RICO claim against Defendant for violation of 18 U.S.C. § 1962(c), treble damages against J.P. Morgan in an amount to be determined at trial, but not less than $1.2 billion, plus punitive damages to be determined at trial;

e) On the Fifth Cause of Action, Plaintiffs' defamation claim against Defendant, compensatory damages against J.P. Morgan in an amount to be determined at trial, but not less than $400 million, plus punitive damages to be determined at trial, as well as an order enjoining J.P. Morgan from further publication of the defamatory statements;

f) On the Sixth Cause of Action, Plaintiffs' reformation claim against Defendant, an

24

order reforming the Trust Agreement to reflect J.P. Morgan's promise to sell the

Properties as soon as possible and enjoining Defendant from selling the Properties

without Plaintiffs' approval;

g)  An order awarding Plaintiffs interest and attorneys' fees, together with the costs of

this action; and

h)  Such other relief as the Court deems just and equitable.

### JURY DEMAND

Plaintiffs demand a trial by jury of all issues properly triable by a jury in this action.

Dated: New York, New York
        June 11, 2018

                                            Respectfully submitted,

                                            MEISTER SEELIG & FEIN LLP

                                            By: _____/s/ Stephen B. Meister_____
                                                  Stephen B. Meister, Esq.
                                                  Michael B. Sloan, Esq.
                                                  Christina Vernaschi, Esq.
                                            125 Park Avenue, 7th Floor
                                            New York, New York 10017
                                            (212) 655-3500

                                            *Attorneys for Plaintiffs*